The clerk, call the next case, please. Thank you. Before you start, I'd like to tell you that Judge Litton is the third person on this panel. He's not here today because he's ill. He will be listening to the tape. All of these are taped. And he will be participating in the conferencing and the decision making. And I also know that he has already reviewed the briefs and would have been fully prepared here this afternoon. So, Ms. Finney? May it please the court and counsel. The petitioner, Eunice Windhorn, in terminating a 30-year marriage, actually just simply came out of it as though she had merely lived with Mr. Windhorn all her life. She came out of it with what she came into it. And the objection that we have as to this is that this completely overlooks the statutes relating to what marital property is. I believe that in this particular case, in fact, a 30-year marriage in which the testimony provided showed that the acquisition of the property during the marriage was not clearly tied into what Mr. Windhorn came into the marriage with. And instead of having the presumption, as it's supposed to, that the presumption that Mr. Windhorn's property that was titled in his name alone, that he had acquired during the marriage, the presumption that it was his private property or non-marital property, be proved, it became the presumption that Ms. Windhorn had to show that this property that was acquired during the marriage was marital property. Isn't that what the prenup did? The prenup is precisely what it says, before the marriage. This is what we came into the marriage with. I don't find in the prenup that says we are going to continue to keep our lives separate in that way. What we came into the marriage with, yes, it's going to remain non-marital. But in fact, Your Honor, the statute, 750-ILCS-5-503-B1, states clearly that all property acquired by either spouse after the marriage, before judgment, is presumed to be marital property. And there has been no evidence that that was done with one piece of property. Now the fact that Mr. Windhorn put his own name on this property as the sole owner does not change the way that it became marital property. It simply says it's in his name, and that is what we have fought against all the way through. If we tie the particular properties owned by Mr. Windhorn at the end of the marriage, and where he has given some to his son and daughter, given some here, there, purchased the farm equipment, etc. It's very clear that what he did after, within the first six years of the marriage, was to take the income from the farm that was worked by both of them, and he purchased the 100 acres, the farm that was the only other addition besides the property down in Arizona, which was then later sold. There are too many factors in there that just do not show that Mr. Windhorn can completely claim this property as coming through his non-marital property. In fact, even in the judgment of dissolution, I believe that it's interesting that on page three of the judgment, the court said in the middle of the page, Mr. Windhorn used the property from a separate property, comma, a separate farm property, or from inherited funds. It wasn't clear where it came from to purchase this property, and that is what the presumption is about. He had the obligation to show that this was purchased from his own property. I'm looking at the pre-marriage agreement, and it says they both agree that if they should acquire property as joint tenants with right of survivorship, then that property shall belong to the survivor. So it sounds like any property that they would be buying during the course of the marriage that was to go to the other would be bought as joint tenants. I'm just looking at this, and it seems to me that it overrides the presumption that you're talking about, that any property that's acquired would be marital property. There's another paragraph in here that I find very confusing, and I don't know exactly what it means. Your Honor, may I? Yes. I found that that part of this, item seven, is talking about if you acquire it, and this is the delineation or the nomination of it, this is owned by Marvin, this is owned jointly by Marvin and Eunice. Nothing ever came into the joint. Why? Because there's testimony in there that it didn't come out that way. When you take a look at number six of the third sentence, Marvin intends to pay the family support, all the family support and expenses, as long as he's financially able. But he didn't. The testimony was in that she had to pay her own trip expenses, she had to buy her own clothes, she had to purchase her own things. He only was the one who solely went out and bought the food. It was a very narrow reading, and if she did try to talk about it, there was also evidence from her that it just didn't end up being worth it, because he didn't let it go. Now, and maybe we're dealing with something here more than somebody that married in 1980. There is a lot of different cultural things that have happened since then, but I believe that he did not, he didn't follow item six fully, and that when he went and purchased property, which was marital property, just because he put it in his own account did not mean that it was not marital property. There is a case law on that. Am I making a mistake here? Am I making it clear, or am I muddling it? I guess I'm just having a hard time. I know that these premarital agreements are not favored in the law, but it is a contract. I just, I don't know how to reconcile. And I guess my other problem is who has the burden of proof with regard to marital property? I mean, your client is claiming that this farm property is marital property. But as near as I can figure out, her claim is all based on some kind of speculation that he had exhausted all of his own personal money, and therefore he must have used marital money or marital property in order to be able to buy this farm, but there's no evidence. So I just don't know where the burden of proof lies either. I believe the evidence is if you go through and you find out what he purchased in her testimony, because he was great at saying, I don't remember, I can't, it may have been that, he wasn't sure on the dates and things like that. He was 93. Yes, Your Honor. You asked about the whose job is it. It's very clear in 750 ILCS 5 slash 503, the disposition of property. It is A7, I'm sorry, A8B1. And that all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage, including non-marital property transferred into some form of co-ownership between spouses, is presumed to be marital property. Is presumed. I believe that answers your question. Whose has the burden of proof? Mr. Windhorn does. He has the burden of proof of showing that anything that he purchased after was non-marital. Otherwise there is a presumption in the favor of my client. So this doesn't count for anything, this agreement? I think what it does count for is to say that Marvin came in with 3A through H and Eunice came in with 4A through E. And unless those have not been, unless those are not there anymore, they are going to keep those. But if they aren't, if they are not there, then we have to find out what happened to them. Especially when you're talking about the new property that was purchased. What you're saying is that the income that either of them derived after the date of their marriage isn't excluded. That becomes marital property. This prenup says what you come in with is what you get if it is death or divorce. I think it said marriage ends either by death or by the law is what their agreement said. But that income and those things that are derived from the date of the marriage until the end of the marriage are marital in nature. And any dispute about that is on the person saying it's not marital in nature. They have to prove that there was no intent for it to be marital property. I don't see in the document that I've read that they said that income derived. He listed assets. He listed some grain he had in storage. I think 19,000 bushels of stored grain. Some cash and investments, his furniture. But presumably when that grain was sold, the money from that... I don't know, did he have another income? What did they use to live? How were the bills paid? To me, the agreement doesn't contemplate that they would not acquire any marital property. It contemplates that what they have at the beginning of their marriage would stay theirs at the end of their marriage. But that those things that were accumulated... Unless it has been commingled or transmuted or something like that. And I agree with that, Your Honor. The presumption seemed to go to the wrong person. Because there is a deed that says Marvin owns this property. That was all there was to it. Nobody said, well, it was purchased during the marriage. Therefore, it is presumed to be marital property. And because of that, my client comes out with basically what she came into the marriage with. And that is not the intent, as I understand it, of what the law of disposition of property says is going to happen. My understanding, and I could be totally wrong about this, is that they maintained completely separate finances throughout the entire 30 years. Is that wrong? Am I wrong about that? No, I don't believe that is wrong. Whether there was willingness to do it or not. If you're shackled with somebody and they want to go that way and you want to go this way, where do you go? One of you at some point, in order to get out of the way of the truck coming towards you or whatever, has to make a decision to go with the other. If she is not, if her testimony was she thought it was going to be shared, but that was not the way it was. His money was his money, her money was her money. Anything that he earned from the sale of the farm that they worked from the time they got married was his. Well, at some point during the 30 years, she must have realized how things were going. Yes, ma'am. And that is why, Your Honor, I say there is a difference. We're talking about an 80- and a 90-year-old person. I think there is something respectful that we have for people who take that vow and say for better or for worse. All those old words, and I don't even know whether they're part of a marriage vow now. And when she finally left, it was because of her health. That is something that I don't think a court can just say, well, she should have gotten out back in 83 or 82 or 81 or two days after the marriage. That wasn't the way things were. And that's not what I'm saying. What I'm saying is that she knew that things were not being shared equally, that things were not being held jointly, and she didn't do anything about it. She acquiesced in maintaining separate estates for all this time, which seems to be consistent with the language of the pre-marriage agreement. I think the testimony is that she did complain and she did disagree, but because of the way that it changed the life between them, it just wasn't worth it. So is that acquiescence? I guess I leave that to you. Thank you, Your Honor. Okay, thank you, Ms. Finney. You do have an opportunity for rebuttal. Mr. Thompson? This marriage was a second marriage for both of them, and there was no issue at trial as to the validity of the pre-marriage agreement. They were both represented by counsel. They were both of an advanced age. They were nearing 60 years of age when they made this agreement. And they both started in with some assets. Mr. Whitmore had some land. He had some machinery. He was in the business of farming. Eunice, the appellant, was a secretary, I think, at an insurance company, and she was going to stop being a secretary at the insurance company and become a housewife. So there was a give and a take in the pre-marital agreement. She is going to stop being a secretary. She's going to be a housewife. He, on his side, is going to come up with all the money that it takes, all the money for living, for providing residence. He provided her two residences. He remodeled the second one, all the transportation, all the insurance, all of the medical care costs, all of the food. I've forgotten a couple of things, but it was all on him. The cost of living was all on him. And he did that? He did that. And as a result, what Mrs. Windhorn had was she was receiving survivor's benefits of Social Security on her first husband who had passed away by the time she was married to Mr. Windhorn here, and those were entirely free from any claim. She had that money coming in, and she could do and did do whatever she wanted with it. And she did very well with it because at the end of one of the last hearings, she gave evidence that her worth was not less than $350,000. She went in with $31,000. She did well. She said, I'm a good investor. She was right. The premarital agreement has some language in it about what happens. I think you're already talking about that in 8, 7 and 8. You're talking about that. A premarital agreement is a contract. We can look to the principles of interpretation of contracts to determine what was met. In this particular respect, it might not be as clear as it could have been, but what did the people do? That's what the trial judge looked at. What did they do during their time of marriage? And you will never find another case where two people had a ledger, and mine is on this side and yours is on that side, than you will in this case. Eunice, she invested, and she did well, but she didn't invest in the farm. Mr. Winhorn kept his money in the farm. That's how he produced the income to maintain both of them with the living expenses and so on and so forth, all the transportation, everything that came with being married. Otherwise, Mrs. Winhorn, the appellant, would have to pay out of her own pocket. That was all taken care of by him the whole time. So they go along this way, and they're each doing their own investing. He's paying all of the living expenses, and a day comes when they want to decide, well, what are we going to do? There's some discussion in here about what they can do with their property. They can leave it any way they want to, it says. So in 2004, both of them went to an attorney, the same attorney in Cisma Park named Terry Hamrick, and they both made wills and a revocable living trust with themselves as the grantors. They put those into effect, and then they transferred both of them, all of their separate property, into their own living trust, which is where it is now, as far as I know. In the course of doing that, my client needed to deed into his living trust. Mrs. Windhorn joined in the deed, the deed of this property and the residence and everything else he had, into his living trust. I suppose that was the choice of the attorney who was doing that work there, who should join in. Natural that the wife would join in because there was a residence there, and they were in residence on that, so she had a homestead interest that would need to be conveyed over. But that's what she did. We say they made their deal. They both lived by their deal. They both got to the day when, as it was provided under the pre-marriage agreement, you can live your property the way you want to, I can live my property the way I want to. Here come the revocable living trusts. They both created them at the same time. They used the same attorney, and they put all that property that they had in their own names into their separate trust, which is Workstate. These people never had a joint bank account. They never had a joint investment account. They never had anything joint. And the property that's at issue here, did that go into Mr. Windhorn's trust at that time? Yes. And she signed off on it? Yes. But was that done for the purpose of dividing their property, or was that done for the purpose of a poor over-willing trust, which is done for the purpose of avoiding federal estate tax, which is very common in farm property where you're talking 115 acres at today's value of over $10,000 an acre, even in Iroquois County. So that allows each spouse then to whether, because that certainly wouldn't matter what their prenup says, but you would do that in order that you can capture the most benefit for singularly-owned property under the federal income tax. Well, if you had an idea, if you had enough land, which they didn't then and still, which they just never had. Well, he's got 115, and he came in with 80, right? There was 110 in this one tract I think that she was talking about. That is with that issue here, and then what he came into the marriage with, even though I understand there is no question on that one. Those are just life interests that he has? And it didn't get to be a big issue because some of that, he had a life estate in from his wife. He inherited from his wife, and they owned half and half, and they had done some of that sort of estate planning with his first wife, who was also an Indianist. But at this point in time, the only objective was simply to get these properties on our side into a living trust so that they would avoid probate. They're not taxable. They weren't taxable in 2004, certainly, because most of the increase in the farm prices probably date from around 2004, and thereafter the last 10 years have been the ones that have really been big. So what they did then was simply what they already foreshadowed that they would do in the marital settlement agreement. But during the marriage, Mr. Windhorn, he paid all the expenses. That was his deal. Mrs. Windhorn was free to do whatever she wanted with her property. She did quite well with it. She had a number of investments, Everett D. Jones, some stocks and bonds, bank stock. She did very well, and she came out with not less than $350,000 at the end. But what they did with the pre-marriage agreement was they drew a wall down the Mrs. Windhorn was on one side and Mr. Windhorn was on the other side. Mr. Windhorn's side was responsible for all these expenses, so that was a charge on his side. The consideration for that was I don't pay any of that. I get to do whatever I want with what I've got. And I completely understand that. What I don't see in this agreement is any discussion about property acquired after the marriage that is in the nature of income. He certainly had crops that he harvested in the years subsequent to the marriage that because he paid expenses with them, marital expenses, that that is by operation of the marriage and dissolution of marriage, it becomes marital in nature. And I don't see how we're going to treat that. I mean, I've seen marital prenups that said that any income derived from my efforts remains mine. I mean, to say that you maintain a separate bank account is all well and good, but it doesn't change the nature of that being marital property from the day you marry going forward, whether you hold the title. I mean, my car is in my own name. That doesn't mean my husband isn't half owner of it legally. Well, that's the way it was on her side. She kept all the income from all the investments that she had. He kept the income on the investments that he had or what he inherited generated on his side subject to charge on his estate that benefited units with respect to all of her living, traveling, medical, insurance, all that was taken care of for her. It wasn't one for the other. I guess where I don't see that is I don't see necessarily ñ I mean, I do see where it says that they intend to marry for love and companionship and they expect that she's going to stop renting and that he's going to pay the family support. I don't see that where they say, and everything that I earn from this day forward remains mine and is not subject to the marital estate. And I'm not ñ I mean, I don't think that there's a problem with contracting for that if it's done properly. I'm struggling with that part because when the law does not favor these things, yet we can contract for them, but the contract needs to specify everything about that relationship. And I do see where they list every property the day they come in to the marriage, but I don't see any provision for income that's going to be derived in the years 1980 moving forward. Do you think that had to be in there? I mean, it says he's paid into Social Security, that they have a 1979 form 1040. Okay. If that wasn't set in such a way as to satisfy you in the document itself, the trial court looked at the way the parties themselves operated under this agreement. If it isn't clear, you look to the conduct of the parties. What did they do? What they did was create two separate financial empires. One had this, the other had that. There was a charge on this one against in favor of that one. That charge was satisfied. It came to the end of where they wanted to go with their own private interests, and they wanted to make their dispositions on their revocable trust, which is a way of doing it, and this is the way they did it. They put this ground and what he had in his name and what his trust and her investments and insurance and whatever else she had of a value of at least $350,000 in another trust, and they left it there. It was that way for nine years before there was any breakup. There's a sentence here that says, they both also agree that if either of them becomes unhappy enough with the marriage to start legal proceedings for separation or to dissolve the marriage, then neither of them shall claim or be awarded any property or money from the other. That's correct, and Judge Ginsburg noted that the appellate had violated that provision, but he didn't do anything about it. Well, I'm not sure that I agree with him that she violated it. It seems to me that her argument is this is marital property because he used marital assets to buy it. It seems to me that her problem is that she didn't prove that. I'm not seeing that there's anything wrong with her asking for it if she thought that it was marital property, but I think that the burden was on her to prove that it was in light of this agreement. Could you explain to me what paragraph 8 means? I've read it several times, and I have no clue what this means. Well, one thing it has to do with is whether Mr. Windhorn would want to give some property, real estate. If he wanted to do that, then Mr. Windhorn would be under an obligation to join in the deeds. If he decided, for example, that he wanted to put the residence that he owns in Cisna Park, which is where they were living at the time, if he wanted to grant that to his children but reserve a live estate to himself, then she would have to join in that deed. Because of her Olmstead interest? Because of what? Why? Because of her Olmstead interest. It arises simply by virtue of her being on the property. Counsel, that's two minutes. Restow is just a waiver of all interest in the property of the other. And is that just real property? It's a catch-all. That's real property? It would be in the property of the other. It doesn't restrict it to real, it's more personal. The basic thing that we had here is they made a deal. They were both getting older. They wanted to live together, so they made a deal. So what's the deal? I got mine, you got yours, but I will take of mine whatever I do with mine, and I will pay every expense you've got, medical, the rest of it. And you can take your marital property of $31,000 plus whatever and do whatever you want with it and make as much money as you can. And she did. She did very well. She accepted the bargain there. She accepted the benefit of that bargain. It was a big benefit. She is not left in a reduced circumstance. Well, I ask that you affirm the judgment of the trial court. Any other questions? Okay, thank you, Mr. Thompson. Ms. Finney? It's five minutes. Five minutes? I won't talk then. The red dressing remarks me back. The testimony of Mrs. Einhorn was, not Einhorn, Windhorn. Judge Einhorn. Start this over again. The testimony of Mrs. Windhorn was that she had a very nice job, and before they married, he made it clear to her that she would not be doing him any favors if she continued with her career. So he wanted her help in earning a million dollars. This is all in the testimony. She stopped being there. And, in fact, there's a famous line in here from opposing counsel who asked my client, after she told she had taken food out to the farmers and people working in the fields, and she drove the trucks and things, but isn't that what a farm wife does? And even while he's talking about her being a housewife, all of these aspects are with the understanding there's no income, and yet one party in there was earning the income for the both of them. He didn't provide. And it says, even in the argument, counsel said that his client provided for Mrs. Windhorn. Testimony of June 16, 2011. She tells how she paid for many things within the house, carpeting. She bought her own clothes. She did these things because he did not provide for them. Does that change the whole premarital agreement? All we're asking for is to recognize that whatever was purchased during the marriage and cannot be traced back, as the court did by this or this, cannot be definitely traced back to non-marital property, is to be regarded as marital property. Okay. Are you asking, or is your client asking, for anything other than this one piece of real property that we're talking about here? Yes, Your Honor. The income that was earned from the time of the marriage. The income on the farm. It's very simple to take what they had. They were so specific about it. It's clear what each of them had. And when you put the two of them together, you can see how it could be divided. She started taking, by the way, her Social Security benefits 10 years into the marriage. I'm sorry, either 10 or 12. I have to check that. Not at age 50. So she did not have the income that he was saying she had her own income. And I think the worst statement that goes on is repeated. She didn't invest in the farm. Yes, she did. Farm wife, if you want to call it, but she drove the truck, provided the food for the workers, et cetera. They did not create two separate empires. She thought she was entering a marriage as she had had before. Not one that she was to continue to work and he was to keep the money. But she stayed in the marriage. Now that the marriage is to be dissolved, she asked that the court would say, and take a look at this and find that there is marital property. And under the law, the person who says that property is not marital has the obligation to rebut the presumption. And that would be Mr. Lindhorn. He has not rebutted that presumption. I have a question. Yes. Do you, if you know, the two trusts that were established, do you know the value of each of their trusts? I'm sorry, Your Honor, I just don't recall it. I don't think I have it with me either. That's okay. Do you have any other questions? No. Thank you very much, all of you. Thank you. Thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand in recess until 9 o'clock tomorrow morning. Thank you.